332 So.2d 54 (1976)
STATE of Florida, DEPARTMENT OF CITRUS, Appellant,
v.
C.V. GRIFFIN, Sr., and C.V. Griffin Groves, a Florida Corporation, etc., et al., Appellees.
No. 75-171.
District Court of Appeal of Florida, Second District.
May 5, 1976.
Rehearing Denied June 2, 1976.
Monterey Campbell, of Campbell, Dunlap, Coward & Blakeman, Bartow, for appellant.
*55 Charles E. Davis and Stephen P. Kanar, of Fishback, Davis, Dominick & Simonet, Orlando, for appellees.
Raymer F. Maguire, Jr., of Maguire, Voorhis & Wells, Orlando, for amicus curiae.
McNULTY, Chief Judge.
This case involves an award of attorney's fees in the amount of $333,000 to counsel for plaintiffs-appellees in a class action under the rationale of Tenney v. City of Miami Beach;[1] that is to say, attorney's fees allegedly due for services rendered to the benefit of members of the class and payable out of a fund allegedly preserved as a result of such services. We reverse.
The fees were awarded in a suit against appellant Department of Citrus challenging the Orange Stabilization Act, § 601.154, F.S. 1967, and a "marketing order" promulgated thereunder. The act empowers the Department of Citrus, subject to referendum among citrus growers and processors, to issue marketing orders to establish and maintain orderly marketing of the orange crop. Pursuant to the act the Florida Department of Citrus, then called the Florida Citrus Commission, promulgated marketing order 105-3.01 in 1968 scheduled to become effective on February 1, 1969. The order set up an administrative committee for the purpose of preparing and operating programs aimed at securing a part of the federal school lunch program market. The committee was empowered, subject to the concurrence of the commission, to "underwrite or subsidize the development of expansion of packaging, dispensing, distributing and marketing techniques and materials best suited to the sale or distribution" of Florida orange products to schools for use by all grade levels. The committee was similarly empowered to underwrite or subsidize the development or expansion of the sale of surplus juices for distribution to schools. These activities were to be funded through an assessment or "tax" of five cents per box of oranges delivered into primary channels of trade. A referendum was held and the order was approved overwhelmingly by the growers and processors affected by the order.
Appellees, producers of citrus who were subject as a class to the tax, then filed an action in December 1968 against the Citrus Commission to contest the constitutionality of the tax, to enjoin the collection of the tax, to enjoin the operation of the order and to refund to the taxpayers the funds collected. They also contended that the composition of the Citrus Commission was illegal.
On June 27, 1969, the trial court entered a summary judgment holding the suit to be a proper class action, declaring the Orange Stabilization Act unconstitutional on grounds of unlawful delegation of legislative power and holding the marketing order invalid.[2] The court then entered a stay order providing that the five cent tax be collected but not spent while the matter was on appeal to the Supreme Court. (These funds, together with accrued interest, now amount to approximately sixteen to seventeen million dollars.)
The ensuing direct appeal to the Supreme Court resulted in a reversal of the trial court on the constitutionality question.[3] That court concluded its opinion as follows:
"As was pointed out earlier in this opinion, a multitude of issues were raised in the pleadings when appellees filed suit for declaratory judgment below. The trial court reserved judgment on many of these issues since the case was disposed of on constitutional grounds. *56 Our opinion today is, therefore, limited to the issues raised on appeal.
"The judgment appealed from is hereby reversed, and this cause is remanded for further treatment consistent with this opinion."
On remand the matter was set for trial on April 27, 1971, but was delayed by two unsuccessful interlocutory appeals taken by the Citrus Commission on discovery matters.[4] The stay order entered by the trial court remained in effect all the while.
Meanwhile, the Citrus Commission proposed an amendment to the controversial marketing order on May 19, 1972. Following another successful referendum the amended order became effective on August 1, 1972. The amended order did not provide for any additional assessments, but neither did it provide that the money collected under the old marketing order be returned to the growers.
Against this new order, on October 26, 1972 plaintiffs filed a "Complaint Re Amended Order 105-3.01," alleging in part:
"Since most of the major premises upon which the [original] Order was adopted have turned out to be false and the Order unworkable, the Defendant has abandoned the purposes thereof and has arbitrarily and capriciously adopted the `New Order' for the purpose of attempting to avoid the restoration of the tax funds to the taxpayers, although the purpose of the Order pursuant to which the taxes were collected has wholly failed, and the New Order seeks to delegate to the defendant entirely different usages of the funds from the purposes for which the funds were collected.
"... The purpose of the New Order is not to remove surplus juice from the primary market to raise prices but rather to fix maximum prices by spending grower tax money to subsidize canners to reduce prices. Such price fixing is directly in violation of Florida Statute 601.154(19) and furthermore, the new purpose is exactly the opposite of the purpose for which the growers were taxed ... This defeats the interests of the grower and constitutes the use of public funds to benefit certain private interests."
They thereupon prayed that the new order be declared unconstitutional, illegal and void.
Yet, paradoxically, appellees now contend here that the situation under the new order is far superior to what it was previously, and the thrust of their argument on appeal is that the adoption of the new order and the preservation of the sixteen million dollar fund was a "victory" and was of great benefit to the orange growers and producers of this state. This necessarily must be their position, of course, if they claim the awarded fees for rendering "beneficial services"; but the logic is evasive.
In any case, subsequent events in this lawsuit were concluded by the trial court as follows:
"Finally, it appeared to this Court that there was a reasonable probability of working out a school marketing program then under study by the Defendant and other citrus organizations, which would not be objectionable, and that developing the necessary programs unhampered by the pendence of this lawsuit would be in the best interest of the parties and of the citrus industry generally. This was brought to the attention of the parties' counsel and on June 18, 1973, the Plaintiffs filed a Motion for Voluntary Dismissal. On June 19, 1973, this Court entered its Order dismissing the case without prejudice and retaining jurisdiction *57 of Plaintiffs' Motion for Payment of Attorneys' Fees."
Testimony was thereafter taken on plaintiffs-appellees' motion for attorney's fees and the trial court held that the services of appellees' attorneys had resulted in a benefit to the plaintiff class. He then awarded the fees here appealed. The Citrus Commission moved for rehearing and, when the rehearing was denied, filed its notice of appeal within thirty days from the order denying rehearing but more than thirty days from the order awarding the fees. Appellees filed a cross-assignment of error, alleging insufficiency of the award, and attack the timeliness of appellant's appeal.
Considering first the question of timeliness of this appeal, it is argued by appellees that since the order awarding attorney's fees was an interlocutory order following a final judgment within the purview of Rule 4.2(a), F.A.R., and considering that the Citrus Commission's motion for rehearing was unauthorized by the rules, the time for taking the appeal was not stayed. The false premise here is that the order under review was an interlocutory one.
To begin with, we point out the order of dismissal entered on June 19, 1973 aforesaid was without prejudice. And we are aware that there is a line of authority that suggests an award of attorney's fees following such a voluntary dismissal without prejudice is a nonfinal judgment reviewable only by certiorari (or, in a case formerly cognizable in equity, by interlocutory appeal pursuant to 4.2, F.A.R.).[5] If this be so, we would agree that a motion for rehearing would not stay the appeal time. But we are of the view that this authority pertains only to matters ordinarily taxable as costs and we think the situation is far different when it applies to an award of attorney's fees in a class action under the authority of Tenney, supra. We have located no Florida authority precisely on point, but the rule repeatedly announced by the United States Supreme Court since 1882 is that such an award supports a full appeal on its own merits even in the absence of a final judgment in the case in chief.[6] While not bound, of course, by these decisions on matters of federal procedure we give them great persuasive weight, especially since two of these cases are the very authority relied upon in Tenney for establishing the right to recover attorney's fees in Florida in a successful class action. Accordingly, we hold first that an award of attorney's fees following the termination of a class action is a final matter and sufficiently substantive of itself to support a full appeal.[7]
We turn now to the merits of the case.
The right to an award of attorney's fees in a successful class action, where a party has established the claim of the members of the class to a common fund, has been established in both Florida[8] as well *58 as in the Federal system.[9] This is an exception to the general rule that such fees cannot be awarded in the absence of contract or statute.[10] But little purpose would be served in reviewing the history of the concept here. Suffice it to say that the basis of the theory is that the plaintiffs' successful litigation confers on the members of a class a substantial benefit in a fund.[11] Here, we hold that even if there was a substantial benefit to the class, as the trial court held, such was clearly not the legal result of the litigation within the theory that allows recovery of plaintiffs' costs.
Appellees vigorously contend that the amended marketing order represented a substantial change from the original order and, therefore, was a benefit to plaintiffs' class. We reiterate, however, that we have serious reservations about plaintiffs' standing to make this argument since, as noted earlier, they themselves had filed a complaint alleging that the same amended order was illegal and constituted a detriment to the class. But this point need not be dispositive, because even under appellees' present theory of the case, the amended order and any potential further developments represent policy or political concessions rather than the resolution of legal rights in and to a fund within the confines of the issues which remained in plaintiffs' lawsuit.
To be specific, plaintiffs-appellees originally contended the marketing order was unconstitutional. If they had prevailed on this argument thereby preserving the $16 million fund, their argument for entitlement to attorney's fees would be strong, although we express no opinion on that point. But plaintiffs squarely lost the case on the constitutional issues when it was presented to the Supreme Court; and surely no entitlement to attorney's fees accrued at the point of the Supreme Court decision reversing the trial court.
It becomes essential then, to examine the issues which remained to be tried in order to ascertain whether any aspect of plaintiffs' lawsuit, in fact, "benefitted" the class within the rationale of Tenney, supra. In a memorandum to the trial court upon remand from the Supreme Court, plaintiffs-appellees submitted a list of fifteen issues which they contended remained for disposition by the trial court. An examination of this list, however, reveals that many of those issues had already been foreclosed by the Supreme Court decision. In fact, only two issues were left even reasonably viable: (1) that the composition of the Citrus Commission was unlawful, and (2) that the adoption of the marketing order was technically deficient because of procedural and referendum defects.
It was while these issues were still pending that the amended order was promulgated and the cause ultimately determined by the aforementioned voluntary dismissal. This sequence of events in no way demonstrates appellees' entitlement to attorney's fees. Our reading of the record convinces us that the amended order was not in fact a change with respect to the remaining issues presented by plaintiffs' lawsuit. There is no showing at all that the amended order cured any of the procedural defects of the original order, nor that any improper or illegal composition of the Citrus Commission has been recognized or altered. Indeed, as noted, the complaint as against the amended marketing order made precisely *59 the same attacks with respect to alleged legal deficiencies as those made against the original order. Additionally, not only did plaintiffs-appellees lose on the legal issues actually adjudicated but there has been no favorable resolution of the legal issues which had not been adjudicated.
Moreover, the apparent amicable settlement after the political change of heart on the part of the commission does not attain the dignity of the "favorable determination" of the cause within the rationale of Tenney, supra. Rather, it is clear that taking the view of the case most favorable to plaintiffs-appellees, they won a political victory not a legal victory in that during the time while the lawsuit was pending the commission ultimately became convinced of the economic wisdom of plaintiffs' views;[12] which, for ought that appears, would likely have occurred even in the absence of the lawsuit. We are aware of no authority that allows appellees' attorneys to be awarded legal fees under such circumstances. Certainly Tenney is not such authority. To uphold such fees would engender a multitude of lawsuits against agencies such as the Department of Citrus with the plaintiffs attempting to take credit (and claiming attorney's fees) for any change in the proposed spending of the taxpayers' money. Furthermore, such a rule would discourage the agency ever to change a proposed course of action for fear that attorneys would claim the credit for the change and receive a share of the fund which had been supposedly preserved.
In the light of our disposition of this case, it is unnecessary to address the points raised on the cross-assignment of error in which appellees seek, as a matter of law, one million dollars in attorney's fees.
In view whereof, the order appealed from should be, and it is hereby, reversed; and the cause is remanded with directions to enter an order denying an award of attorney's fees payable to plaintiffs-appellees.
HOBSON and BOARDMAN, JJ., concur.
NOTES
[1] (1942), 152 Fla. 126, 11 So.2d 188.
[2] See Griffin v. Florida Citrus Commission (1969), 32 Fla. Supp. 139.
[3] See State, Department of Citrus v. Griffin (Fla. 1970), 239 So.2d 577.
[4] See Florida Citrus Commission v. Griffin (Fla.App.2d, 1971), 249 So.2d 42; State, Department of Citrus v. Griffin and Griffin v. State, Department of Citrus (Fla.App.2d, 1972), 257 So.2d 116; (cert. discharged (Fla. 1972), 266 So.2d 36).
[5] See Campbell v. Maze (Fla.App. 4th, 1975), 307 So.2d 234; Granoff v. Cherin (Fla.App. 3d, 1972), 270 So.2d 430; Craft v. Clarembeaux (Fla.App. 2d, 1964), 162 So.2d 325. But cf. Giachetti v. Johnson (Fla.App. 2d, 1975), 308 So.2d 143. A similar rule applies to an order awarding costs after a declaration of mistrial, Lake Region Paradise Island, Inc. v. Graviss (Fla.App. 2d, 1975), 323 So.2d 610.
[6] See Cohen v. Beneficial Industrial Loan Corp. (1949), 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528; Sprague v. Ticonic National Bank (1939), 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184; Trustees of the Internal Improvement Fund v. Greenough (1882), 105 U.S. 527, 26 L.Ed. 1157.
[7] Cf. Small v. Small (Fla. 1975), 313 So.2d 749, 753 (concurring opinion of Justice England).
[8] See Tenney v. City of Miami Beach, supra. The rule in Tenney has been frequently cited, but litigants have had little success in recovering attorney's fees under this theory. See also City of Miami Beach v. Sterin (Fla. App. 3d, 1968), 214 So.2d 358; City of Miami v. Lehman (Fla.App. 3d, 1961), 134 So.2d 527; Larson v. Warren (Fla. 1961), 132 So.2d 177; City of Ormond Beach v. Cook (Fla. 1955), 81 So.2d 481.
[9] For a discussion of the history of this concept in the federal courts, see Dawson, Lawyers and Involuntary Clients; Attorney Fees From Funds, 87 Harv.L.Rev. 1597 (1974); and Dawson Lawyers and Involuntary Clients in Public Interest Litigation, 88 Harv.L.Rev. 849 (1975).
[10] See Giachetti v. Johnson (Fla.App. 2d, 1975), 308 So.2d 143; Campbell v. Maze (Fla.App. 4th, 1975), 307 So.2d 234.
[11] See Dawson, Lawyers and Involuntary Clients; Attorney Fees From Fund, n. 9, supra at p. 1626.
[12] We think the plaintiffs' view of their entitlement to legal fees was well summarized in the testimony of one of their attorneys, Mr. Davis, on the hearing on attorney's fees:

"Q. What have been the consequences of the litigation?
A. Well, the effect of it was that we preserved the fund from expenditure under the original order. If the fund had been expended to subsidize the sale to the Federal government to give away to the schools, it would have in my opinion, have disrupted the orderly marketing of citrus products. That's been, I think, the amendment of the order was the point at which we agreed, since under the amendment they could make sales other than for this lunch program. So I consider that through our efforts we preserved the fund, we have saved the market from a disastrous effort that would have been bad instead of good; we have gradually, I trust, through this accumulated interest on the fund, which now comes to about two and a half million dollars, and in the process of this litigation, maybe, I think we are entitled to more credit than we are, we have all come to a substantial meeting of the minds about the basic needs to solve the problem, and I believe that the solution of that problem is now being conducted by the Citrus Commission, and they have got the funds to do it with, which we preserved."